UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) <br> ) <br> 5K UTILITY AND CONSTRUCTION, INC. ) <br> ) <br>       DEBTOR ) <br> _____ ) | Case No.   3:09-05808 <br> Chapter     11 <br> Judge       Lundin |

**NATIONAL CITY'S OBJECTION TO CONFIRMATION OF DEBTOR'S PLAN AND SUPPLEMENTAL STATEMENT IN SUPPORT OF LENDERS' OMNIBUS MOTION**

Through undersigned counsel, National City Equipment Finance ("NCEF"), a secured creditor, and National City Bank ("NCB"), a secured creditor, submits this (a) objection to confirmation of the Debtors' proposed chapter 11 plan of reorganization (the "Proposed Plan") and (b) supplemental statement in support of that prior Expedited Motion to Intercept Payment From W&O Construction and to, in the alternative: (i) Dismiss Case, (ii) Convert Case to Chapter 7, or (iii) Compel the Debtor to Abandon Assets (the "Lenders' Omnibus Motion"). As grounds for this objection and Lenders' Omnibus Motion, NCEF and NCB (collectively, the "Lenders") state as follows:

As set forth more fully below, the Lenders object to confirmation of the Debtor's Proposed Plan on the following grounds: the Proposed Plan is not feasible, the Proposed Plan is not presented in good faith, the Proposed Plan violates the absolute priority rule and the Proposed Plan unfairly discriminates against the Lenders and unsecured creditors. Simply put, this is not a reorganization case and confirmation should be denied. To the extent the Court denies confirmation, the Lenders seek an order granting, alternatively, dismissal of this chapter 11 case, conversion to chapter 7, or compelling the Debtor to abandon the Lenders' collateral to the Lenders.

## Background Facts

1. NCEF holds a first security interest in, and lien on, all of the Debtor's accounts, general intangibles, equipment, inventory, and personal property, including numerous motor vehicles, as described in the documents attached to NCEF's proof of claim filed in this case. NCB holds a second priority interest in, and lien on, all of the Debtor's accounts, general intangibles, equipment, inventory, and personal property, including numerous motor vehicles, as described in the documents attached to NCB's proof of claim filed in this case. The Lenders' respective liens have been confirmed through the entry of the Cash Collateral Orders:

   a. AGREED FINAL ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION, entered August 20, 2009 (the "First Cash Collateral Order"); and

   b. SECOND AGREED ORDER AUTHORIZING DEBTOR'S USE OF CASH COLLATERAL, PROVIDING ADEQUATE PROTECTION, AND SETTING HEARING ON NATIONAL CITY'S OMNIBUS MOTION, entered December 1, 2009 (the "Second Cash Collateral Order," and together with the First Cash Collateral Order, the "Cash Collateral Orders").

Moreover, the Debtor has dismissed with prejudice its complaint against the Lenders (Adv. Pro. No. 09-407) (the "Adversary Proceeding"), whereby the Debtor had challenged the extent of the Lenders' liens.

2. The Debtor, as to its larger term loan, is past due for February, March, April and May 25, 2009 payments, each in the amount of $32,043.73, for a total of $128,174.92. It has not paid the Lenders for months, and the obligations to the Lenders are accruing interest at the rate of $7,314.60 every thirty days.

3. At a meeting on June 15, 2008, in the presence of the Debtor, counsel for the Debtor, local counsel to the Lenders, and by telephone, a representative of the Lenders and primary counsel for the Lenders, the Debtor and the Lenders negotiated a form of

interim order, which was presented to the Court and entered on June 29, 2009 (the "Interim Order"). The Court set a final hearing on cash collateral for August 11, 2009 (the "Final Cash Collateral Hearing").

4. The Interim Order provided for adequate protection payments of $10,000.00, or roughly one third (1/3) of the scheduled monthly payments under the applicable loan documents and for the filing a plan of reorganization before the expiration of the Interim Order. The plan requirement was so that the Debtor could bid on additional jobs from the State of Tennessee which according to the Debtor was awarding jobs during the summer. If the Debtor were unable to win such contracts, the Debtor acknowledged that a reorganization was not possible and the case would be wound up. The Debtor did not win any such jobs and has no future contracts. Accordingly, there is no basis for a reorganization.

5. The Debtor failed to timely make the adequate protection payment scheduled for July 31, 2009 and also failed to timely file a plan of reorganization before August 15, 2009, as required by section 16(c) of the Interim Order, both of which constituted defaults under the Interim Order (the "Interim Defaults") and caused immediate cessation of the use of the Lender's Cash Collateral.

6. At the Final Cash Collateral Hearing, counsel for the Debtors acknowledged the Interim Defaults and made announcement to the Court that the Lenders and the Debtor would enter into an agreed order regarding the prohibition of the Debtor's use of the Lenders' Cash Collateral. The Final Cash Collateral Hearing was adjourned pending a settled form of order. Counsel to the Lenders drafted such an order but the Debtor sought terms from the Lenders for entry of a final cash collateral order.

7. At a meeting in the presence of the Debtor, counsel for the Debtor and local

counsel to the Lenders, the Debtor and the Lenders negotiated the form of the Final Order, which was presented to the Court at the adjourned Final Cash Collateral Hearing and entered on August 20, 2009. Under the First Cash Collateral Order, the Debtor agreed to make certain adequate protection payments due August 31, 2009, September 15, 2009, and September 30, 2009.

8. The Debtor has not made the $10,000 adequate protection payment to the Lenders required by Section 10(b) of the First Cash Collateral Order, the $30,000 adequate protection payment to the Lenders required by Section 10(c) of the First Cash Collateral Order, or the $15,000.00 payment to the Lenders required by Section 10(d) of the First Cash Collateral Order, each of which failure constitutes a Default under Section 16(a) of the First Cash Collateral Order (together with the Interim Defaults, the "Prior Defaults") and immediately terminated the Debtor's right to use the Lenders' cash collateral on August 31, 2009 (Section 17). Moreover, the Lenders' rights with respect to the Interim Defaults were preserved pursuant to Section 18 of the First Cash Collateral Order.

9. Months after entry of the First Cash Collateral Order, the Debtor filed a motion to reconsider the First Cash Collateral Order (the "Reconsideration Motion") and the Adversary Proceeding despite the clear open and clear process by which the terms of the First Cash Collateral Order was reached. Ultimately, the parties resolved the Reconsideration Motion and the Adversary Proceeding, as reflected by the Second Cash Collateral Order. The Prior Defaults under the Interim Order and the First Cash Collateral Order were preserved pursuant to section 21 of the Second Cash Collateral Order.

10. The principal terms of the Second Cash Collateral Order (including without limitation a budget and other reporting requirements) were discussed and an agreement in principle was reached on November 2, 2009. Although the Lenders provided a draft of the

Second Cash Collateral Order to the Debtor and its counsel on November 4, 2009, the Debtor, despite multiple requests by the Lenders, did not provide authority to upload the proposed Second Cash Collateral Motion until November 25, 2009.

11. The key concept of the Second Cash Collateral Order was to provide a "cash flow sweep" of excess cash flow to the Lenders, as set forth in section 13 of the Second Cash Collateral Order, to be based upon an agreed-upon budget for costs and expenses. No payments have been made in accordance with section 13 of the Second Cash Collateral (the "Payment Default").

12. Despite multiple demands by the Lenders, to date, which is nine (9) days prior to the expiration of the entire forty-five (45) days cash collateral period, the Debtor has failed to provide (1) a single budget as required each week by section 9(a)(i) of the Second Cash Collateral Order; (2) any weekly reconciliation of the required budgets as required by section 9(a)(ii) of the Second Cash Collateral Order, (3) any time records for certain Surprise family members as required by section 9(a)(iii) of the Second Cash Collateral Order, (4) any updates regarding contracts and potential future business, and (5) any updates regarding joint check arrangements (collectively, the "Reporting Defaults").

13. In addition, in light of the lack of time records for the Surprise family members, the Lenders are skeptical that the wage caps reflected in section 10(c) of the Second Cash Collateral Order are being followed, especially since the Monthly Operating Reports predating the Second Cash Collateral Order appear to reflect wages in excess of the cap amounts for the Surprise family members. Any excess payments would be a further default under the Second Cash Collateral Order (the "Wage Default," together with the Payment Default and the Reporting Defaults, the "Current Defaults").

14. Any one of the Current Defaults was sufficient to and actually did cease the

5
Case 3:09-bk-05808    Doc 172    Filed 12/09/09    Entered 12/09/09 10:48:45    Desc Main
Document    Page 5 of 13

Debtor's authority to use the Lenders' Cash Collateral pursuant to Section 19 of the Second Cash Collateral Order.

15. While the Cash Collateral issues were being resolved, the Debtor filed its Proposed Plan and accompanying disclosure statement on November 1, 2009. Some key terms of the Proposed Plan and the disclosure statement include:

    a. Violation of the Absolute Priority Rule (as admitted by the Debtor), whereby Kevin Surprise retains ownership in the Debtor in exchange for a $5,000 payment;

    b. Payment to the Lenders (Class 3B) of $10,000 per month, with a balloon payment due 37 months after confirmation;

    c. No independent valuations of the Debtor's assets to support the terms of the Proposed Plan; and

    d. No liquidation analysis.

## Objection to Confirmation

16. This is a small business case, requiring confirmation of the Proposed Plan on or before December 16, 2009, or forty-five days from the filing of the Proposed Plan and accompanying disclosure statement, which was filed on November 1, 2009. In light of the numerous fatal flaws of the Proposed Plan, confirmation must be denied on the following grounds:

    a. The Proposed Plan is not feasible;

    b. The Proposed Plan is proposed in bad faith; and

    c. The Proposed Plan violates the absolute priority rule and discriminates unfairly against the Lenders and unsecured creditors.

### Feasibility of the Proposed Plan

17. Pursuant to Section 1129(a)(11), a requirement for confirmation of a plan is that "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

18. The Proposed Plan is not feasible, as the Plan merely delays the inevitable. Having no contracts in hand other than one that is due for final payment around the end of the year and another with work to be completed by the middle of next year, the Debtor's projections extend only through May of 2010. In contrast, the Proposed Plan proposes a monthly payment of $10,000 to the Lenders for a thirty-six (36) month period. The Debtor has failed to produce any new contracts despite repeated requests for updates by the Lenders and affirmative reporting obligations under the Second Cash Collateral Order. With no further contracts in hand and no prospects for revenue producing work beyond the next 6 months, the Proposed Plan is speculative at best.

19. Moreover, the Debtor has shown no ability to project accurately during these cases. Despite having agreed to make adequate protection payments under the Cash Collateral Orders, the Debtor has missed the vast majority of such payments. The Second Cash Collateral Order was envisioned as a cash flow sweep, but despite repeated request by the Lenders, no visibility has been provided, let alone payments. Even producing simple documentary records to support certain expenses, such as time records for Kevin Surprise's family members employed by the Debtor, have proven to be too tall a task. In sum, the Debtor has demonstrated an inability to manage its affairs, and the projections, as inadequate as they are in terms of duration, should be given no weight.

20. Moreover, the projections themselves cannot withstand even preliminary

scrutiny. The proposed payments of $10,000 per month are less than one third (1/3) of the monthly debt service payment on the term note, with no documented prospects for refinancing of the balloon payment to be made three (3) years down the road. In essence, the Debtors propose a negatively amortizing debt obligation that they have been unable to meet during this case while making little to no payments on account of any prepetition debt. The increased burden of additional creditor payments under the Proposed Plan diminish the likelihood of success of the Proposed Plan given ------------that, to date, the Debtor has failed to demonstrate the ability even to pay adequate protection payments to NCB.

21. Finally, the Proposed Plan lacks foundational support for confirmation. The Proposed Plan and accompanying disclosure statement (i) provide no valuation information other than the Debtor's beliefs as to value and (ii) do not include a formal liquidation analysis.

<u>Bad Faith</u>

22. Section 1129(a)(3) requires that a plan be proposed in good faith. The Proposed Plan fails that test, especially in light of the Debtor's blatant disregard for the requirements of the Cash Collateral Orders, including multiple payment defaults. The Debtor has, among other things, failed to timely make all but one of the adequate protection payments under the Cash Collateral Orders, has failed to provide any weekly budget information to the Lenders as required by the Second Cash Collateral Order, has failed to provide any time records for family members employed by the Debtor as required by the Second Cash Collateral Order, and has failed to provide any updates or visibility into the prospect of new contracts even bid on by the Debtor as required by the Second Cash Collateral Order.

23. It is clear that the Debtor's principal, Kevin Surprise, is attempting to use the

Proposed Plan as a way to reduce his personal guaranty obligations. While that goal is not necessarily impermissible, the Proposed Plan must still comply with the Bankruptcy Code. The Proposed Plan is so far afield of confirmation requirements that it cannot be construed as proposed in good faith.

24. The Proposed Plan in essence is a continuation of certain features of the Cash Collateral Orders (i.e. payment to the Lenders of $10,000 per month) until the string runs out on the Debtor's contracts. In light of no actual contracts being won for future business, and there being no prospects for business activities beyond the middle of next year, a three-year Proposed Plan does not pass the good faith test.

25. As described above, the Debtor has been unable to make virtually any payments to the Lenders under the Cash Collateral Orders, yet the Proposed Plan contemplates a negatively amortizing payment of $10,000 per month to the Lenders. In short, the Proposed Plan obligates the Debtor to make the monthly payments to the Lenders without any increased income and yet at the same time make additional debt payments to other secured and unsecured creditors. The Debtor's inability to make the vast majority of the adequate protection payments during this case undercuts its good faith arguments in light of the Debtor's stagnant income levels and increased payment obligations to other creditors.

<u>Absolute Priority Rule and Discrimination</u>

26. Pursuant to Section 1129(a)(8), a requirement for confirmation of a plan is that each class of claims or interests must accept the plan or be unimpaired by the plan; otherwise, the debtor must meet the "cramdown" requirements of Section 1129(b) of not discriminating unfairly and being fair and equitable to an unaccepting class. 11 U.S.C. § 1129(a)(8) & 1129(b). The Lenders do not consent to their respective treatment under the

9
Case 3:09-bk-05808   Doc 172   Filed 12/09/09   Entered 12/09/09 10:48:45   Desc Main
Document      Page 9 of 13

Proposed Plan and will vote against the Proposed Plan. As a result, confirmation must be through the cram-down provisions of 11 U.S.C. § 1129(b).

27. In a cramdown scenario, secured claimants in a non-accepting class must either (a) retain their liens and receive deferred cash payments, as of the effective date of the plan, equal to the allowed amount of their claim or (b) receive the indubitable equivalent of their claims; otherwise, holders of equity interests may not receive any property on account of such equity interest. 11 U.S.C. §§ 1129(b)(1) & 1129(b)(2)(A). Moreover, unsecured claimants must receive either deferred cash payments equal to their claim amount or that no one junior to such claimant retain any interest in the debtor. 11 U.S.C. §§ 1129(b)(1) & 1129(b)(2)(B). These confirmation requirements are known as the "absolute priority rule."

28. The Debtor's Proposed Plan and accompanying disclosure statement clearly indicate that the Proposed Plan fails this test. The Proposed Plan provides for the retention of the Lenders' liens on their collateral, however, the deferred cash payments, in the form of a negatively amortizing obligation with a balloon payment after three (3) years, do not pass muster. A forced forbearance on negatively amortizing terms does not meet the indubitable equivalent requirement either. Moreover, the Debtor's proposed retention of its ownership by Kevin Surprise runs afoul of any unsecured creditors' rights under the absolute priority rule. As a result, the Proposed Plan discriminates unfairly against the Lenders and any unsecured creditors in this case.

29. There is a generally recognized exception to the absolute priority rule for "new value." Bank of Am. Nat'l Trust & Savs. Ass'n v.203 N. LaSalle St. P'ship, 526 U.S. 434, 432 (1999); Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.), 800 F.2d 581 (6th Cir. 1986); In re Creekside Landing, Ltd., 140 B.R. 713, 716-19

(Bankr. M.D. Tenn. 1992). To qualify for the new value exception in the Sixth Circuit, existing equity's contribution to the reorganized debtor must be "(1) necessary and essential to the success of the reorganization and (2) reasonably equivalent to the interests retained." In re Target Graphics, Inc., 372 B.R. 866, 872 (E.D. Tenn. 2007) (citing In re Crosscreek Apartments, Ltd., 213 B.R. 521, 546 (Bankr. E.D. Tenn. 1997) (characterizing the second prong as requiring the new contribution to be "substantial") (citations omitted)

30. The Debtors admit to the violation of the absolute priority rule, as Kevin Surprise is to retain ownership of the Debtor in exchange for a $5,000 payment to the Debtor. In an attempt to meet the market test requirements under 203 North LaSalle for the value to be provided by Mr. Surprise, the Debtor proposes that creditors or parties in interest could offer more money. What such process ignores however, is how state licensing requirements might impact ownership and operation of the Debtor.

31. The Debtor proposes a one-time payment of $5,000 from Kevin Surprise in exchange for retention of ownership in the Debtor. While any cash infusion should be welcome to support the Proposed Plan, the proposed payments is woefully inadequate to capitalize the Debtor in light of the Debtor's projections. Such inadequacy means there is no "success of the reorganization" as contemplated under Target Graphics. As a result, the Proposed Plan fails the new value exception to the absolute priority rule and cannot be confirmed.

32. The Lenders also join any and all objections raised to the Proposed Plan and accompanying disclosure statement, to the extent such objection/s are not inconsistent herewith, and further reserve their rights to contest confirmation of the Proposed Plan on any grounds, whether or not contained herein or in any joined objection.

11
Case 3:09-bk-05808   Doc 172   Filed 12/09/09   Entered 12/09/09 10:48:45   Desc Main
Document      Page 11 of 13

## Supplement to Lenders' Omnibus Motion

33. The Lenders incorporate the facts and arguments stated above into the Lenders' Omnibus Motion. The Lenders further reserve any and all rights to supplement same.

34. In light of the Debtor's multiple Prior Defaults and Current Defaults under both Cash Collateral Orders, the Lenders seek to collect their collateral from the Debtor.

WHEREFORE, premises considered, the Lenders seek an order granting the following relief:

    a) Denying approval of the Debtor's disclosure statement and confirmation of the Proposed Plan; and

    b) Alternatively,

        i. Dismissing this bankruptcy case;

        ii. Converting this case to one under chapter 7; or

        iii. Compelling the Debtor to abandon its interests in the Lenders' collateral to the Lenders; and

    c) Such other and further relief as may be appropriate.

RESPECTFULLY SUBMITTED:

*s/ Robert J. Welhoelter*
Robert J. Welhoelter (TN BPR #24203)
ROBERT J. WELHOELTER, Attorney at Law
320 31st Avenue North, Suite A
Nashville, Tennessee 37203
Telephone: (615) 760-5871
Facsimile: (615) 760-5873
rjwelho@gmail.com

*and*

**MORGAN & POTTINGER, P.S.C.**

John A. Majors
601 West Main Street
Louisville, KY 40202
502.560.6758 (Telephone)
502.560.6858 (Facsimile)

*Co-Counsel to the Lenders*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served through the Court's CM/ECF system on this the 9th day of December, 2009.

*s/ Robert J. Welhoelter*